Good morning, your honors. If it pleases the court, my name is Gretchen Fuselier and I represent the defendant appellant Albert Jordan. This arises from Mr. Jordan's conviction on two counts of count one, passing and uttering a counterfeit check, knowing that it was counterfeit and with the intent to defraud. And count two was the possession, knowing possession of the counterfeit check. It's our contention, your honors, that the informant, Mr. Sellers, who was himself contacted by postal investigators in December of 2000 because he had been depositing stolen counterfeit treasury checks into his account of his used car business, when that became apparent, the postal inspector visited him and gave him the card according to Mr. Sellers' testimony and advised him that he was in big trouble and to contact him with information of others who were involved in this kind of transaction. In fact, in January of 2001, Mr. Sellers was arrested on those charges and he began to work along with the government to get information on behalf of others, for of others who were involved in order to assist himself in getting some leniency in a future sentencing. In fact, Mr. Sellers testified that his attorney in February advised him to go out and find out information on others who can help you at the time of sentencing. In March, Mr. Sellers entered into a plea agreement with the government. In February, without rehashing all of the facts, by circuitous types of events, Mr. Sellers indicated that he became aware of Mr. Jordan and started meeting with Mr. Jordan and had numerous amounts of conversations with Mr. Jordan from February through September of 2001. Mr. Sellers testified for this eight-month period of time, Mr. Jordan never indicated that he had sent clients to Mr. Sellers' used auto business in order to buy used cars with counterfeit treasury checks. Mr. Jordan never indicated to Mr. Sellers that he was involved in any schemes involving counterfeit treasury checks. However, Mr. Sellers apparently is extremely lucky because after he had a proffer session with the government on August the 9th, that same date, he met with Mr. Jordan and indicates that a conversation regarding counterfeit treasury checks arose. During this time, there were no wires on Mr. Sellers, no tape recordings, except one which occurred September the 7th. Two days later, on September the 9th, the government arranged for Mr. Sellers to meet with Mr. Jordan. And just for some background for that meeting, in August, the government had provided Mr. Sellers with two names in order to put on counterfeit treasury checks. At the September 19th meeting, Mr. Sellers testified that Mr. Jordan passed to him in the Denny's restaurant two counterfeit treasury checks. That transaction was not on tape. Yes, that was a white envelope that was passed underneath the table. There were some government officials watching. That's correct. They were not close enough to the table to hear any of the conversation. And matter of fact, they testified they did not even see anything pass under the table. Yes, that's correct. It's our position that Mr. Sellers is an unreliable informant and that the information he provided also is unreliable. The circumstances surrounding the observations by the government agents at the September 19th meeting was nothing more than outwardly innocent acts. During the jury trial, the bench trial, because Mr. Jordan had waived the jury trial, the judge in listening to Mr. Sellers' testimony became somewhat conflicted and interrupted the examination and said to Mr. Sellers, your testimony is incredible. It's incredulous. Why would someone who you never met before on the first meeting start talking about criminal conduct? And subsequent to that, Mr. Sellers' testimony never became, in a review at the standard that this Court must review the testimony to determine the sufficiency of the evidence, in our opinion, never became credible. When Mr. Sellers was asked if he had met with Mr. Sellers before September the 19th or August the 9th, his response was, I don't remember. Yet previously in his testimony, he indicated he had had several meetings with Mr. Sellers before those dates. It becomes important to analyze the credibility of Mr. Sellers, especially in light of the defendant's statements submitted to the jury trial. And Mr. Jordan indicated in that statement that previous to September the 19th, he had had discussions with Mr. Sellers regarding the business that Mr. Jordan was in, and that was to assist persons who were in foreclosure, to assist them in saving their house. And he was arrested. He had a counterfeit check found in his house. That's correct, Your Honor. However, we do believe that the information, as we briefed in our appellant's opening brief, that the search was invalid because of the lack of sufficiently credible information. Again, the information was only that provided by Mr. Sellers. If I recall from the record, I don't recall seeing a motion to suppress that was made before trial. That's correct, Your Honor. Trial counsel did not make a motion to suppress. However, we believe... The rest of your argument is that Sellers was unreliable, could not be believed, and that being the case, that Mr. Jordan did not make a motion to suppress. There was not enough in evidence before the trial judge to cause your client to be convicted, guilty of the offense, beyond a reasonable doubt. That's correct, Your Honor. And if this Court finds that there were sufficient evidence, we also indicated in our briefs that we believe that over an eight-month period, when there was no mention of any treasurer in the case, that Mr. Jordan was unreliable. We believe that Mr. Jordan was unreliable, and that Mr. Jordan was not able to have a transfer of two counterfeit treasury checks, either counterfeited or legitimate by Mr. Jordan, ultimately to have a transfer of two counterfeit treasury checks when Mr. Jordan indicated in his sentencing statement that he had met previously with Mr. Sellers for the purpose of discussing their mutual foreclosure business. Mr. Sellers, in fact, supports that version by indicating in his testimony that they had discussed in detail Mr. Sellers' and Mr. Gordon's activities in assisting others from losing properties to foreclosure. Mr. Jordan, as you may recall from the brief indicated, and from the appellant's excerpts of records, indicated in that statement that when they met September the 19th, it was because Mr. Jordan intended to meet with Mr. Jordan for the purpose of discussing their mutual foreclosure business. And Mr. Jordan indicated that he intended to return a profile, a property profile to Mr. Sellers because it was the wrong one that he had received from Mr. Sellers at a previous meeting, along with two checks. Mr. Sellers, in fact, according to Mr. Jordan's statement, advised Mr. Jordan that the couple of people who were in Denny's were his brokers, and he didn't want them to see him receive this package back. And it was at Mr. Sellers' instruction that this was passed underneath the check. Do you want to say a little something? Yes, Your Honor, I think I will. Thank you. Let me ask you this. What does the fusilier mean? It's French. Fusilier is the correct pronunciation, and it means sharpshooter. And recently in the Iraqi war, they have had several articles on the fusilier battalion from the British Army. It's also something like the mounted police in Canada, but the origin is from the French Royal Fusiliers of France. I learned something. Thanks. I thought it was the person who lit the fuse on the cannon. May it please the Court, Fred Rowley, Jr. for the Government. Thank you. Your Honor, if that was the only evidence that the defendant had abandoned an entrapment defense, perhaps plain error would be appropriate. In the close of the evidence, after the cooperator, Mr. Sellers, had testified at length, and after the District Court had inquired into the relationship between Mr. Sellers and the defendant, the defense still did not argue entrapment. So in those circumstances, the Government submits that a waiver really is the appropriate way of viewing the record. To the extent that the arguments about, again, about the relationship between Mr. Sellers and the defendant go to the sufficiency of the evidence, it's important to note that the Government introduced other Your Honor, the District Court was clearly mindful of the fact that entrapment was a potential issue. And on its own, the Court did ask Mr. Sellers, the cooperator, whether he had encouraged the defendant to engage in criminal conduct. At transcript page 183, the Court put that question to the cooperator. The cooperator said no. The District Court then followed up and asked, you were just playing along? And the cooperator said yes. The Court then asked, you were hoping something would happen? And the cooperator said yes, sir. So the Court was aware of this and did on its own. I was not, Your Honor. All right. Well, let's see if we can answer this question. If the Government, you know, understood that entrapment was an issue, was there evidence that you had the burden? You know, the Government could have presented in terms of predisposition? Yes, Your Honor. At the outset of the hearing, when the defense indicated that it would not be pursuing entrapment, the Court noted and the Government agreed that its motion, that the Government's motion to introduce evidence of the defendant's prior offenses was essentially moot. And so the Government, in reliance upon the representation that there would be no entrapment defense, did not seek to introduce evidence of his prior fraud offense, and that evidence was not received. So as Your Honor has pointed out, there was potential rebuttal evidence that was not introduced because the understanding of both the Court and the Government was that an entrapment defense was not on the table. Again, getting back to the sufficiency issue, there was other evidence to corroborate the cooperator's account first. I didn't hear any argument from Ms. Fusilier about entrapment. Your Honor, I agree. It was just unclear to me whether it went to sufficiency or entrapment, and I wanted to make clear the Government's position that to the extent the idea... It was argued in the blue brief. Yes, Your Honor. Not here today, though. On the sufficiency issue, though, there was other evidence introduced to corroborate the cooperator's testimony. First, there were the agents who saw the transaction take place on September 19th. I'm sorry, yes, September 19th, 2001 at Denny's. There was a postal inspector, a Secret Service agent. They did see the defendant pull out a white envelope from his jacket, lean into the table with his hands under the table. Now, as the Court pointed out in argument earlier, the agents did not see the actual handoff underneath the table. But what the agents did see was consistent with the testimony provided by the cooperator, Mr. Sellers. Mr. Sellers testified that he received the checks under the table. And, in fact, the defense did not argue in its brief, did not contest the fact that the defendant actually possessed the envelope. Now, the fact that the defendant handed the envelope over in a surreptitious manner certainly suggests that he knew that what was inside the envelope was legal, but there was yet further evidence. At the time of the defendant's arrest, the agents who searched his jacket found handwritten notes with a list of checks and check amounts with a specific reference to check washing. I believe that the statement was next to a check amount, an amount of money handwritten on the note, if rejected, wash and deposit. There were other handwritten notes with personal information belonging to other people, credit ratings, Social Security numbers. There was a handwritten note listing 21 places at which the defendant could cash checks. There was, in addition, a photocopy of a credit card and a driver's license belonging to another person. All this was found on the defendant's person at the time of the arrest. And what it shows is that the defendant is familiar with and, indeed, was likely involved in check fraud, credit card fraud and identity theft. And all that goes to the defendant's knowledge with respect to both the treasury checks that he handed over on September 7th and the counterfeit cashier's check that was found on his person at the time of his arrest on September 19th. In addition to that evidence, there was the taped conversation. There was one taped conversation on September 7th, 2001, before the treasury check transaction. In that conversation, the defendant asks the cooperator, Mr. Sellers, whether his contact is still interested in buying, still interested in buying. And from the context of the conversation, it's clear that what they're talking about buying is checks. There's a reference to 10 checks in increments of 1,000, 1,500. Later on in the conversation, the defendant asks the cooperator about a contact that the cooperator purported to have who possessed state checks. And the defendant remarks that they could cash a lot of checks. That conversation, in conjunction with the evidence that was found on his person and in conjunction with the observations that the agents made at the time of this transaction on September 7th, established the defendant's knowledge that the checks were counterfeit and, indeed, would support this verdict, given the standard of review and the deferential standard of review, even apart from the cooperator's testimony. I would just add, the defense at oral argument stated that the district court found the cooperator's testimony incredible. But if you look at the transcript as a whole, what appears to have happened is the district court was confused by the cooperator's testimony because he was leaving out a couple of key points. The story that the cooperator told about his prior offense and its relationship to the transactions that were charged against the defendant was coming in in kind of a piecemeal fashion. The court didn't understand what D's role D is the woman who the cooperator testified gave his number and his name to the defendant, who then, according to the cooperator, referred potential car buyers to the cooperator, Mr. Sellers, who had a used car lot. So the district court was confused about D's role, didn't understand that D was the person who had referred the cooperator, Mr. Sellers, to the defendant, and also didn't understand how the cooperator, Mr. Sellers, recognized the defendant when he called. Once the cooperator, Mr. Sellers, provided a narrative account, told his story from start to finish, the district court understood those issues. And in fact, at the close of the evidence and in argument, the district court noted that in its view, Mr. Sellers, the cooperator, was, quote, not a terribly experienced guy in this field, the field of counterfeit check cashing. So the district court clearly credited the cooperator's testimony. That was not, certainly that was an appropriate thing to do, given the corroborating evidence. The government submits that the conviction was proper and should stand. Just briefly in rebuttal, relating to the entrapment defense and any rebuttal information and testimony that the government might have presented on the issue of predisposition. Well, there was no entrapment defense, right? No, there was not. And, of course, the government's position is that it was way too big. No, there could have been. They might have had a defense been presented. I would only point out in the sealed pre-sentence report on page 6 that any priors that the government might have referred to were priors from 1989 and 1991. So there was almost a period of 10 years between any prior Penal Code section 470 of forgery and also a battery, which certainly would not be related to counterfeit check uttering in his defense. In passing. Again, well, I haven't mentioned before, but I would like to indicate, as my brief does, that Mr. Jordan is quite infirm. Although he was sentenced to 12 months, he served part of that, without credit, I believe it appears, in the VA's hospital needing many medical diagnostic tests and procedures. At this point, I believe that a 74-year-old man who, looking at the excerpts of record with apparent variety of serious medical conditions, may have, as the sentencing position papers indicated, been unable to rationalize if he, in fact, were involved in uttering and creating counterfeit treasury checks. I think maybe as his medical records bear out, his judgment may have been impaired. And on that, I would submit.
judges: Pregerson, Tashima, Paez